# SECTION (3 or C)
# DEFENDANT'S PROOF / EVIDENCE OF <u>FRAUD ACTIONS IN THE COURTS</u>

CASE NUMBER: 1:06CV00123
JUDGE: ROYCE C. LAMBERTH
DECK TYPE: FOIA / PRIVACY
   ACT
DATE STAMP: 01/23/2006

147

**LAW OFFICES OF JEFFERY M. LEVING, LTD.**
19 S. LaSalle, Suite 450   (312) 807-3990
Chicago, IL 60603-4511

008395

DATE 4-21 19 99

RECEIVED FROM Samuel Clemmons

THE SUM OF One Hundred twenty DOLLARS $ 120

FOR Consultation

AMOUNT OF ACCOUNT $
AMOUNT PAID $ 120    *Thank You!*
BALANCE DUE $
☐ CASH  ☑ CHECK  ☐ M.O.  ☐ CREDIT CARD    BY [signature]

147

# CONTRACT FOR PROFESSIONAL LEGAL SERVICES

**URGENT REPLY REQUESTED!**

148

This document constitutes and is the whole of a memorandum of a Contract for Professional Legal Services entered into between LAW OFFICES OF JEFFERY M. LEVING, LTD. (hereinafter "LAW OFFICES"), and the undersigned CLIENT.

The undersigned CLIENT acknowledges that he or she has voluntarily and knowingly entered into this Contract. It is mutually agreed that the retainer fee for the legal services described below is $ _7500_ . If said retainer fee is diminished to a credit balance of $500 or less, then a like retainer fee amount is due to LAW OFFICES as a continuing retainer with the exception that a greater retainer may be requested and will be due for trial if requested. The retainer fee and continuing ones paid to LAW OFFICES are the sole property of LAW OFFICES upon receipt by LAW OFFICES subject to any applicable right of reimbursement. Unless otherwise noted herein, the retainer fee is to be paid in a single lump sum. The LAW OFFICES hourly rate is $285.00 per hour for office and non-court time, and $325.00 per hour for court time, depositions and time outside of the office (except as otherwise provided). Jeffery M. Leving's hourly rate is $400.00 per hour for office and non-court time and $450.00 per hour for court time, depositions and time outside the office (except as otherwise provided). Paralegal services are billed at $85.00 per hour. Non-lawyer investigative services are billed at $125.00 per hour. Eighteen minutes is the minimum billing unit for office or non-court time, one hour is the minimum billing unit for court time. LAW OFFICES can and shall delegate this case or duties as it deems appropriate to any one or more of its attorneys. Travel time is billed as non-court time. CLIENT will be responsible for paying one hour of non-court time if CLIENT has a scheduled appointment with LAW OFFICES, fails to appear for such appointment and fails to give the LAW OFFICES at least 24 hours notice of canceling the appointment. CLIENT understands that, although time is considered in fee determination, other factors including but not limited to attorneys' expertise, complexity of the matter, unique questions, property involved, and responsibility of lawyer(s) are considered in arriving at a fee. LAW OFFICES shall have the right to apply any or all of said retainer and continuing retainer funds to any attorneys fees and costs owing to LAW OFFICES by CLIENT as a result of any prior, concurrent or subsequent representation of CLIENT by LAW OFFICES in any matters. Work is billed at all the rates set herein. Telephone conferences are billed as non-court time. Services that are provided with less than one week notice in order to meet a deadline to prepare or participate in court or discovery, or at request of CLIENT, or on weekends and holidays, or between 7:00 p.m. and 6:00 a.m., are billed at the rate of 150% of the above hourly rates per this agreement. Appellate work is excluded herein.

It is understood that prompt payment of LAW OFFICES' bill(s) is expected and that on unpaid balances, statutory interest will be added. If court proceedings are instituted against the CLIENT to collect its bill(s), the cost of those proceedings and reasonable attorneys' fees will be added to the subsequent judgment or out-of-court settlement.

Payment of the professional services fee, if not in the above mentioned lump sum fashion, is scheduled as follows:

The nature and extent of legal services contracted for by this Agreement is as follows: _Petition for Visitation & to enroll judgment in Wisconsin & all other necessary & reasonable pleadings related thereto._

LAW OFFICES' attorneys are not licensed to practice law in the State of _Wisconsin_ and shall require the filing of a pro hac vice motion by _Wisconsin_ Counsel. LAW OFFICES shall retain local counsel at CLIENT's sole financial responsibility. LAW OFFICES shall bill local counsel's time to CLIENT at LAW OFFICES' rates set forth in this contract. LAW OFFICES will pay local counsel's rates for the services rendered which will be lower than LAW OFFICES' rates set forth in this contract. CLIENT will be informed as to the rate(s) paid to local counsel upon a written request to LAW OFFICES. CLIENT consents to the employment of local counsel and to LAW OFFICES payment to local counsel of fees less than the fees charged to CLIENT by LAW OFFICES.

No alteration or amendment to or of this Agreement shall be valid unless reduced to writing and signed by the Parties' signatory to this Agreement.

That jurisdiction and venue of any fee and/or other dispute between the parties to or from this agreement will be in the Municipal or Law Division of the Circuit Court of Cook County, Illinois at LAW OFFICES' election. Illinois law governs all the terms in this agreement at LAW OFFICES' election.

CLIENT agrees to pay litigation expenses, witness fees, travel expenses, deposition expenses, faxes, local counsel's reasonable and necessary costs, etc., as said expenses are incurred. These expenses are not included in the above quoted fee(s).

Credit in one case can be applied to another at firm's discretion.

CLIENT authorizes LAW OFFICES to accept payment[s] toward CLIENT's bill from third parties, and to communicate attorney-client privileged information herein to any and all experts retained by LAW OFFICES or/and CLIENT, if any. CLIENT represents that no conflict will be created to LAW OFFICES by its representation herein of CLIENT. If any part of this Contract is unenforceable, then the remainder of this Contract is still valid and enforceable.

WRITTEN AND EXECUTED this _15_ day of _MAY_ 19_99_ at Chicago, Illinois.

_____          _____
LAW OFFICES OF JEFFERY M. LEVING, LTD.                CLIENT - Signature
19 SOUTH LASALLE STREET, SUITE 450
CHICAGO, ILLINOIS  60603   (312) 807-3990         _Samuel L. Clemmons, Jr_
                                                         CLIENT - Print

*(handwritten note at bottom):* No work to be done until retainer is paid & a signed contract ~~these terms~~ is returned to law offices. These terms shall be available to the client no longer than May 31, 1999. In any case, client must personally contact law offices prior to commencement of any representation at any time.

(140)

Samuel Clemmons
3933 N. Clarendon #305
Chicago, IL 60613

Law Offices of
**JEFFERY M. LEVING, LTD.**
19 S. LaSalle • Suite 450
Chicago, Illinois 60602



# Fathers' Rights

## HARD-HITTING AND FAIR ADVICE FOR EVERY FATHER INVOLVED IN A CUSTODY DISPUTE

▶ LEARN HOW TO:

- Find an effective and empathetic attorney
- Stay in control of your emotions
- Avoid unfavorable custody arrangements
- Protect your relationship with your child
- Overcome the "tender years" bias
- Craft a "Shared Parenting Agreement"
- Make allies of psychologists, social workers & arbitrators
- Remain financially solvent

**JEFFERY M. LEVING**
America's Leading Fathers' Rights Attorney
with KENNETH A. DACHMAN, PH.D.

# MEN'S DIVORCE RIGHTS

*Attorneys protecting father's rights.*



*Jeffery Leving during his recent appearance on Nightline with Ted Koppel.*

Law Offices of

**JEFFERY M. LEVING, LTD.**

19 S. LaSalle • Suite 450
Chicago, Illinois 60602

**312-807-3990**

advertisement

THE DAILY CALUMET WEDNESDAY, JANUARY 1, 1986

© Copyright Daily Calumet 1987

# LIFE STYLES

## Parents get equal time

# Custody law implemented

by Janis Parker

CHICAGO — In the majority of divorce cases involving children, the mother is almost automatically given custody of the children (unless she is proven to be unfit), while the father is granted visiting rights and made to provide financial support.

Beginning this month, a new bill has been signed into law by Gov. James Thompson which will legally enable parents to have joint custody of their children. Both parents will have equal rights and equal responsibility for raising their children, which prevents "one parent from having total power over the offspring.

Attorney Jeffery Leving, co-writer of the law and a men's rights lawyer, said fathers want to raise their children even though they are estranged from the mother.

"The parents will have to write, with a mediator if necessary, a joint parenting agreement which will include the education, health, etc. for the children. If one of the parents does not cooperate with the agreement, he or she will be in contempt of court," Leving said.

A MEDIATOR IS USED to help parents agree on custody arrangements if there is a dispute. This agreement does not have to be a 50/50 arrangement, but it will decide all major concerns for the child. If parents cannot agree, a judge can step in.

Sheila Malkind, of the Advocates for Shared Custody, divorced her husband when her children were young. They are now teen-agers. She and her former husband drafted a parenting agreement, and her children have benefited from being raised by both parents although they are divorced.

"Joint custody is basically for parents who both want their kids. Mothers usually get custody, but fathers now want more involvement in raising their children.

"My children benefit from this arrangement because they wanted both of us. They did not want to be with me all week and spend weekends with their father," Malkind said.

The arrangement the Malkinds made was that each parent would have the children every other night. Malkind said her daughter recently decided she no longer wanted to go back and forth between her parents' homes, and is presently living with her father. Her son thinks the arrangement made was the best because, according to Malkind, he did not want the divorce. He wanted (and have) both of his parents.

"MEN HAVE BECOME more sensitive to women because of the women's movement. It is important that fathers show they care about their children and they want to be more involved with raising their kids.

"When there is no joint custody, one parent may drop out of the child's life and research has shown that fathers tend to give less financial support when they don't feel the kids care about them," Malkind said.

Joint custody will probably work fine with older children, but Malkind and Leving agree the custody of babies will probably go to the mother, simply because they are the mother, with the father being allowed to visit for several hours each day.

Under the new law, both parents do not have to agree to joint custody. Previously, joint custody was granted only if the mother agreed and mothers usually don't agree to this arrangement, according to Leving.

"Joint custody has usually meant fathers see their children once or twice a month," Leving commented.

He added although Cook County is progressive, there are still traditional judges who feel mothers should have sole custody of the children.

"BOTH PARENTS ARE needed to raise the children. Both parents should have maximum involvement in their children. There are some who are against the kids being shuffled around between the parents' homes, but children are shuffled anyway — between school and babysitters," Leving said.

"When parents divorce, the children go through a mourning period. They feel inadequate, like it is their fault. They need both parents."

Besides custody, there are problems of alleged child abuse and kidnapping as the result of divorce. According to Leving, some abuse cases are falsified to create leverage for custody.

"Because there are so many made-up stories of child abuse, when there is an actual case of abuse it is taken lightly, because of the false allegations. That's the problem that has to be dealt with," Leving said.

Malkind added children are sometimes kidnapped by the parent who is not granted custody, but with the joint custody law, parents will have to petition the court in order to leave the state with the children.

# Chicago Daily Law Bulletin
Since 1854

## Thompson signs joint custody bill

By DEBRA WILLARD
Law Bulletin staff writer

SPRINGFIELD — A bill signed by Gov. James R. Thompson will significantly change the procedure for determining whether to grant joint custody of a child while not creating a legal presumption in favor of joint custody.

S.B. 749 reduces the ability of one parent to veto joint custody while encouraging parents to become involved in negotiating the terms of an agreement. The law creates a presumption that the maximum involvement and cooperation of both parents is in the child's best interest.

The new law eliminates the requirement that former spouses must both agree they want joint custody before it is granted. The court may impose joint custody if it feels it is in the child's best interest or it may override a parental veto against joint custody.

Parents will now be requested to file a "joint parenting agreement," which will specify each parent's rights and responsibilities for the personal care of the child and for decisions such as education, health care and religious training.

In the event that the parents' disagreements prevent them from producing such an agreement, the court has the authority to enter a "joint parenting order." In this way, the law urges parents to participate in their child's upbringing, even if only one parent has physical custody.

The court also has the authority to compel joint custody when it is determined that the parties might work well together after they have recovered from their dissolution. The changes take effect Jan. 1, 1986.

The sponsor of the measure, Sen. Bob Kustra, R. Des Plaines

Continued on back page
CUSTODY

## Custody
Continued from page 1

said, "evidence showed that circumstances warranted a joint custody law to improve a child's contact with both parents. Often, children are given the impression they have lost one parent through a divorce. Joint custody keeps in the child's mind that both parents are participating in the upbringing."

The current law states that joint custody may not be awarded unless the parents agree with both the imposition of joint custody and its specific terms. Either parent can veto an award of joint custody.

The bill was written by a group which included attorneys and psychologists who wanted the children's interest to take precedence over that of the parents.

Chicago attorney Jeff Leving, who helped write the bill, said, "The old joint custody law is pro-female. If a father wanted joint custody, the mother could say no and that would be the end of it." He said the new law will prevent children from becoming bargaining chips in a dissolution.

A bill introduced this session by Rep. Larry Hicks, D-Mt. Vernon, would have required the court to always award joint custody unless it was not in the minor's best interest. The bill was tabled in the House Judiciary I Committee.

## PERSONAL VIEW

# Don't forget the rights of fathers

### By Jeffery M. Leving

In the days since the Supreme Court released its opinion in Webster vs. Reproductive Health Services, many groups on both sides of the issue have spoken out about what we in Illinois should do about a woman's right for abortion. But one side has remained silent— the fathers of the unborn children.

As a matrimonial attorney, I work daily in Chicago with anguished fathers who have little or no say in the lives of their children. The anguish of these men becomes unimaginable when the child is not yet born and they have no way of protecting the life they have helped create.

We now have the opportunity to conduct a rational debate on all sides of the abortion issue and we should take this chance to balance the rights of the father, as well as the mother and child, and create the most equitable law possible.

Making all abortions illegal, or restricting all but life-preserving abortions, will not solve the problem for anyone. This course would only deny mothers *and* fathers any meaningful choice. Furthermore, banning abortions will force women into the back alleys, where they will be endangered and beyond the reach of fathers who want to and need to be included in such a significant decision.

Under past Supreme Court rulings, fathers were denied any voice in the issue, whether they were married to the mother or not.

The government has turned the issue of reproductive rights back to the states, and we in Illinois should use this ruling as the basis to create the fairest and most realistic law possible. To do this, we must listen to every side of this very emotional and very important issue and remember that fathers should have rights, too.

*Jeffery M. Leving is a Chicago matrimonial attorney who lives on the Near North Side.*

Reprinted with permission from the Chicago Sun-Times, Inc. 1989.

---

THE DAILY CALUMET THURSDAY, SEPTEMBER 4, 1986 SECT. A PAGE 7

# Grandparents have rights, too

### by Janis Parker

*(Editor's note: The names in this story have been changed to protect those involved.)*

CHICAGO — Angela runs and jumps into her grandmother's arms, wrapping her legs around the older woman's waist. She holds on tightly, refusing to let go. Angela knows the time she has with Grandma is limited and each moment is dear to the two of them.

Grandparents Day is Sept. 7 and is a day when grandparents are honored as a special part of the family. Angela's situation is not the typical grandchild/grandparent relationship, however.

Angela, 6, is estranged from her paternal grandparents and other family members because her parents are separated. Her mother has little to do with her in-laws and therefore limits her daughter's contact with them. The grandmother, Marian Nettles, is fighting in court for visitation rights with her youngest grandchild.

Nettles has five grandchildren and has "raised them all." Angela is the youngest and it breaks Nettles' heart she does not have a close relationship with her. Her son and daughter-in-law are not divorced yet and the family's visitation rights and child support have been in litigation for more than three years. The next court date is this week, and the Nettles are hoping a decision finally will be made.

"MY SON'S WIFE won't let us see Angela," Nettles said. "At one time she said if we let her live in my son's home rent-free she would let us visit our granddaughter. We agreed and plans were made for a four-hour visit from 2 to 6 p.m. After being with Angela for one hour and 15 minutes, my daughter-in-law told me she had an appointment and I would have to leave. That was three weeks ago and I have not seen Angela since."

Grandparents can be affected by separation and divorce much like the spouse who does not gain custody of the child(ren). They can gain their rights through the court system, but many do not go in to court and accept whatever conditions the custodial parent sets. Many do not know they have legal ground to stand on.

Attorney Jeffery Leving specializes in divorce custody cases and presently is representing three families who are seeking visitation rights for their children, including the grandparents. He explained there is a legal procedure for grandparents to see their grandchildren.

"GRANDPARENTS MAY not know they have the right to visitation," Leving said. "This right can be included in the original divorce agreement or grandparents can take the spouse into court. Usually the paternal grandparents are the ones who are affected."

According to Illinois state law, "The court may grant reasonable visitation privileges to a grandparent or great-grandparent of any minor child upon the grandparents' or great-grandparents' petition to the court with notice to the parties required to be notified under Section 601 of this Act...if the court determines it is in the best interests and welfare of the child, it may issue any necessary orders to enforce such visitation privileges."

Nettles is concerned her granddaughter will not have strong bonds with her paternal family.

"There is a strong bond between grandparents and grandkids. They need us and they miss out when they don't know their grandparents," she said.

"We are all Angela has. My daughter-in-law's mother died. Angela loves visiting with us and when she comes, she doesn't want to go home."

ALTHOUGH THE CASE returns to court this week, "it's like being in a snake pit," according to Nettles.

"It seems like we are not getting anyplace. The case has been in litigation all this time and my daughter-in-law keeps drumming up reasons why we should not have visitation rights. At least we do get to see Angela some since we agreed to let my daughter-in-law stay in the house rent-free, but my son never sees his daughter. His wife won't allow it," Nettles said.

© Copyright Daily Calumet 1987

# New joint custody law puts child first

## PERSONAL VIEW

### By Jeffery M. Leving

The New Illinois Joint Custody Law, which became effective Jan. 1, should allow both parents the chance to have an equal voice in major decisions concerning the child's health, education and welfare.

The old law required that parents agree to joint custody before it would be awarded. Under the new law this has changed. A judge may now order joint custody when he or she feels it is in the child's best interest to do so, even if the parents do not agree to the imposition of joint custody. The new law presumes that maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of their child is in the best interest of the child. Unfortunately, the new law does not presume that an order awarding joint custody is in the best interests of the child.

The new joint custody law is an attempt to ensure that the child remain a major part of both parent's lives. Major decisions regarding the child should become a product of both parents' wishes, not just one parent's.

The bottom line is an attempt to keep the child's life as undisturbed as possible after a divorce. When parents can no longer get along, joint custody should allow the child's relationship with both parents to remain as similar as possible to the relationship they shared prior to a divorce. The child needs a stable relationship with both parents, not just one.

There are factors that parents and/or court should consider when determining if joint custody is appropriate. They include:
- The child's wishes.
- The interrelation of the child to people who may affect his or her best interest (that is, grandparents, siblings, etc.).
- The residential circumstances of the parents with regard to the child's school and community so that major adjustments in the child's daily routine will be minimized.
- Any threat of physical violence to the child or witnessed by the child.
- The parents' emotional and economic stability as well as their ability to cooperate where the child's best interest is concerned (how close did the parents get to an agreement without court intervention?).
- All other factors relevant to the child's best interest.

In cases where joint custody is at issue, the new law requires a Joint Parenting Agreement be drafted. It is generally in the best interest of the child that the parents cooperate to determine the provisions of a Joint Parenting Agreement. If, however, the parents cannot independently reach an agreement, the court has the power to enter a Joint Parenting Order.

A Joint Parenting Agreement or Joint Parenting Order shall contain a detailed explanation of each parent's powers, right and responsibilities for the personal care of the child. Provisions for major decisions regarding the child, such as education, health care and religious training, are also required. A time period for review of the terms of the agreement or order, procedures regarding changes, disputes and alleged breaches shall be specifically set out in the agreement or order. Lastly, the child's physical residence and a detailed schedule of times the child will spend with each parent must be included.

But there is no presumption that joint custody means equal parenting time.

It must be remembered, it is the child and his or her best interest that should be controlling. A positive result should naturally flow from maximum cooperation between parents in drafting a positive agreement.

*Lawyer Jeffery M. Leving contributed to the drafting of the new Illinois Joint Custody Law.*

# Chicago Sun-Times

**CHICAGO SUN-TIMES, Friday, March 11, 1988**

## COMMENTARY

# Divorced dads don't deserve humiliation

### By Jeffery M. Leving

According to a recent Chicago Sun-Times article, State Public Aid Director Edward T. Duffy tried public humiliation to shame the state's "10 most-wanted men" for the nonpayment of child support. The article seemed to portray certain fathers as deadbeats and fatherhood as possibly being just another word for irresponsibility.

However, the article did not describe the helpless feelings many fathers experience in attempting simply to visit their children. It did not relate the gut-wrenching feelings certain fathers experience in not even knowing where their children live or what schools they are attending.

**PERSONAL VIEW**

The article did not touch on the fact that the state's attorney's office represents custodial parents "at no cost to them" to collect back child support, yet it cannot by law offer the same free services to indigent non-custodial parents who are not receiving their court-ordered visitation.

Legal representation by the state's attorney's office is limited to child support and does not extend to visitation, pursuant to the Illinois Marriage and Dissolution of Marriage Act.

But is the collection of child support more important than the enforcement of court-ordered visitation rights? I hope not. Both rights should generally be of equal importance in protecting the "best interest of the child."

It appears that our public policy may be to place the collection of child support above the enforcement of visitation rights. If this is true, then who is protecting the children who can end up the ultimate victims in this deadly game of alienation of affections and denial of visitation rights? Father loss and deep feelings of rejection may be the end result for innocent children.

Many immigrants come to this country with little or no money, but their children grew up to be leaders of our current society. The answer was family stability, not material wealth. Money is not an adequate substitute for healthy parent-child relationships.

The Illinois Marriage and Dissolution of Marriage Act states (concerning custody determinations) that "the court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of their child is in the best interest of the child."

But can this legal presumption concerning the "best interest of the child" really be effectuated if the custodial parent is entitled to preferential treatment?

The preservation of our family unit also extends to preserving the father-child relationship—and preserving the emotional well-being of our society's children, not just collecting money in a vacuum.

If children are not protected, then the mental health profession may be the growth industry of the future.

One of the damnable aspects of child support, visitation and custody litigation is that children can be treated as commodities. But children should never be sold, bought and traded in broken-up and scattered families.

This conduct, if allowed, can only give cruelty a deeper meaning.

Society should be deeply concerned about gender bias and children's right to the protection of the family unit. Our society's foundation, the family unit, depends on it.

*Jeffery M. Leving is a Chicago matrimonial attorney.*

Reprinted with permission from the Chicago Sun-Times, Inc. 1989.

## PERSONAL VIEW

# Make visitation denial a crime

**By Jeffery M. Leving**

It is not a crime for a person to interfere with a parent's legal visitation rights, because House Bill 2401 died in the Illinois House of Representatives.

A person would have violated this proposed statute by depriving a non-custodial parent (generally a father) of visitation rights by detaining or concealing a child. The bill would have made the third conviction a Class A misdemeanor punishable by up to a year in jail and/or a fine of up to $1000.

This bill was a long-awaited attempt to solve the ever-increasing problem of enforcing visitation rights. With its defeat, there still is virtually no consistent, agressive enforcement of visitation rights for typical non-custodial parents, and abuses are widespread.

Besides raising awareness of the problem of visitation interference, this bill also would have allowed non-custodial parents free legal services through the state's attorney's office.

To date, most legislation has focused on the collection of child support payments. But non-custodial parents who are denied visitation rights often must pay substantial legal fees to have any hope of seeing their children when a custodial parent persistently violates court-ordered visitation. There also are no reciprocal agreements among states when custodial parents flee to avoid compliance with visitation rights, as there are when non-custodial parents flee to avoid child support. Consequently, parents who want to see their children must go from state to state hiring lawyers, with no certainty of success.

As a matrimonial lawyer in Chicago, I see the emotional strain divorce has on families. It is especially hard on children. Denying them contact with a father can be emotionally damaging. Children can be the ultimate victims when visitation rights are violated and cannot be enforced.

Society and our legal system must realize that fathers deserve the right to see their children without the financial and emotional upheaval of extended civil litigation. This game of alienation of affections and denial of visitation rights can only cause emotional stress for all parties concerned, especially children. Violating visitation orders should have grave consequences for the wrongdoer.

Our society needs a criminal law dealing with visitation abuse. When more attention is given to this issue, the ultimate winners will be the children who stay in contact with both parents who love them.

*Jeffery M. Leving is a lawyer specializing in family/custody law.*

5—CHICAGO DAILY LAW BULLETIN    Tuesday, Oct. 12, 1993
Reprinted with permission from the Chicago Daily Law Bulletin 1996.

Friday, Febr. 7, 1992    CHICAGO DAILY LAW BULLETIN—5

# Visitation interference soon to be a state crime

### By JEFFERY M. LEVING

A new state criminal law will substantially overhaul the system of enforcing visitation orders entered in family law cases.

The new law may soon allow certain non-custodial parents, who are generally fathers, to have contact with their children with whom they may have otherwise lost all contact.

The new law will make "unlawful visitation interference" a crime effective Jan. 1, 1994. A third conviction under this law will result in the violator's being guilty of a Class A misdemeanor, which is punishable by incarceration in other than a penitentiary for less than one year.

The new law will most likely open the door for enforcement of visitation orders by the criminal courts and police, and will hopefully decrease the disruption to the father-child relationship. Added protection for children, who can easily end up the ultimate victims in the deadly game of visitation abuse, is another positive aspect of this law.

> Denial of visitation has destructive effects on the child and the non-custodial parent.

Non-custodians, usually fathers, often fight vigorously, and at times fruitlessly, for enforcement of visitation by the courts. The frustrating ordeal of some of these parents can be magnified if the courts are unable to enforce their visitation orders.

As noted in Jeff Strang's article "Visitation Orders Now Enforceable!" in the Children's Rights Council of Illinois newsletter (fall 1993), "Denial and abuse of court visitation orders are at an epidemic proportion."

This new law will most likely give fathers a less costly and less bureaucratic means to have uninterrupted time with their children. Often, denial of visitation has destructive effects on the child and the non-custodial parent. Studies have shown that the absence of the father causes adverse social, emotional, academic and psychological effects on children. For example, the Center for Disease Control and Prevention was conducting a study into what may be causing the disorders. The CDCP found that 85 percent of such children came from homes without fathers.

This law should help facilitate visitation, strengthen the father-child bonds that ultimately should benefit the child and blaze a new trail toward recognizing the rights of children.

*Jeffery M. Leving and his six-attorney firm in Chicago concentrate in family and custody law. Leving also helped draft the Illinois law on joint custody, and he has testified before the General Assembly on behalf of family-related bills.*

# More visitation ensures more child support: report

### By JEFFERY M. LEVING

A U.S. government agency has reported there is a causal connection between visitation compliance and the payment of child support. Joint custody is also examined and factored into this equation.

This report from the Census Bureau, called "Child Support and Alimony: 1989" and released Oct. 11, 1991, reported for the first time that fathers without visitation or joint custody pay only 44.5 percent of child support owed, but fathers with visitation pay 79.1 percent of child support owed. Moreover, fathers with joint custody pay 90.2 percent of child support owed. The report was based on income reported by mothers having custody.

A careful look at this report also shows that many fathers do not have either visitation or joint custody. This is a problem that many of my clients have relayed to me during conferences in my office.

Our current system of a child support is not working for everyone, and the Census Bureau Report shows the real dilemma. You cannot solve the child support delinquency problem in a vacuum, with only punitive measures against fathers.

More visitation and joint custody will produce more child support and probably improve children's relationships with both their parents — not just one.

It is essential that we start looking for solutions to the problems confronting our children. We must investigate all problems and all possible solutions.

The number of single-parent homes and divorces have sky-rocketed. Many fathers are not able to participate in rearing their children, and some fathers have no contact with their children at all — even though it is important to the children's development that fathers and mothers both participate in rearing them.

Child support delinquencies are not the only causes of our children's problems. The denial of visitation to fathers and our crumbling family structure is another issue that needs to be addressed.

Many people came to this country poor, but they raised their children to become emotionally and financially stable adults. What these people did have, though, were extended families, honesty, self-sacrifice and the notion that the family unit was sacred.

The preservation of the family and old-fashioned values surely won't hurt the kids.

Copies of the Census Bureau's report are available for $2.50 from the U.S. Government Printing Office, Washington, D.C. 20402. Telephone (202) 783-3238. It is the Current Population Report on Consumer Income, Series P-50-No. 173, Order No. 803-005-30020-O-W.

*Jeffery M. Leving and his firm, Law Offices of Jeffery M. Leving Ltd., concentrate in family and custody law. Leving helped draft the Illinois Joint Custody Act.*



P.O. Box 28558
Atlanta, GA 30358

August 13, 2005

State of Wisconsin
Clerk of Circuit Court
Milwaukee County Courthouse
901 N. 9th Street
Milwaukee, WI 53233

To Whom This May Concern:

I am writing this request on behalf of Mr. Samuel L. Clemmons regarding the attached fraudulent Family D Summons request submission coming from your court on May 6, 2002 with a case number assigned as **02FA003672**.

Please provide our office with the final disposition of this matter and what action was administrated to the fraudulent plaintiff for filing such a fraudulent complaint in your court of jurisdiction.

The filing subject was married at the time to another person by the name of Shannon Free making her to be a bigamist in your court and the State of Wisconsin.

We will be on standby to receive your information in a timely manner. We appreciate your attention concerning this request.

Sincerely,

Mary L. Lee
Paralegal

/mll

Attachment



NEXT PAGE

**Tonya R. Clemmons (Powell), (Petitioner)**
**V.**
**Samuel L. Clemmons, (Respondent)**

      **Case number: 02FA003672 (FRAUD)**

August 28, 2002

We are sending this notice before the courts on Mr. Clemmons behalf, Mr. Clemmons supporters is fully aware of this matter and for the record and for your hearing we file his response.

**Sequence of events:**

1. On July 15, 1993, Mr. Clemmons filed for a legal separation from his spouse. See Mr. Clemmons' complaint filed just as Mrs. Clemmons should have provided the courts when she file this complaint with your court. Mrs. Clemmons or Powell had to complete a legal document before a notary stating that no such actions were filed against her or pending concerning this matter. If she filed such complaint her complaint does not hold any merit in your court.

2. On January 27, 1995, Mr. Clemmons signed his request for divorce from Mrs. Clemmons or Tonya Powell and Mrs. Clemmons or Powell notice was delivered on February 4th, 1995. As you can see in the document that such notice was filed in the courts on February 13th, 1995. Since that time the two has not reconcile.

3. On May 19th, 1995, proof of publication was filed ordering the divorce. Mrs. Clemmons or Powell was subpoena to appear for the hearing but failed to appear therefore defaulting.

4. During the year of 1994 to present, Mrs. Clemmons or Powell had remarried and had her live in husband by the name of Shannon Free taking care of her needs and having the so claim children of Mr. Clemmons call Shannon Free daddy. Mrs. Clemmons or Powell had taught the children that Mr. Clemmons was no longer their father but Shannon Free was their father. From that time

period, Mr. Clemmons was kept from seeing or visiting the children.

5. During the year of 1997 – 1999, Mr. Clemmons lived in the Chicago area and visited the city of Milwaukee, Wisconsin regularly and was still denied the rights to have the children visit him or him visited the children. During this time, Mr. Clemmons did seek further legal advice after the divorce in default.

6. Mr. Clemmons will be seeking further legal assistance after receiving such wrongful filing in your courts.

7. Mr. Clemmons will not be appearing due to other hardships and other urgent business. This matter was over by default years ago. If Mrs. Clemmons or Powell is trying to gain something she should be ordered from your court system to return back to the Chancery Court of Lincoln County in Brookhaven, Mississippi to retrieve her divorce papers. The courts should question her why she is not divorce and answer questions as to why she stray away from cooperating with the legal justice system?

8. Please advise Mrs. Clemmons or Powell do not send any of her business to a private mail box where she does not do business. I'm just a person who works with Mr. Clemmons and knows his character and I must say he is indeed a very nice and great person to know.

9. I would say this on his behalf, Mr. Clemmons loved his family but did not love the way his ex-spouse handle their affairs and used innocent children for her personal gain. Mr. Clemmons filed for divorce in a respectfully manner and did not go behind anyone backs to make false claims or statements such as this. Mrs. Clemmons or Powell knows where Mr. Clemmons' relatives live and she knows how to reach him for conversation. We wonder why she refused to handle her matters in a proper fashion. Your courts should question Mrs. Clemmons or Tonya Powell's when she appears before you alone.

10. End of response to this fraudulent inquiry in your court.